## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| EAST TEXAS MEDICAL CENTER | § | |
| REGIONAL HEALTHCARE SYSTEM, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CAUSE NO. 6:04-CV-165 |
| | § | |
| LEXINGTON INSURANCE COMPANY, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER ON DEFENDANT'S
## RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

Before the Court is Defendant Lexington Insurance Company's ("Lexington")
Renewed Motion for Judgment as a Matter of Law (Docket Entry No. 125), Plaintiff East
Texas Medical Center Regional Health System's ("ETMC") Response (Docket Entry No.
133), and the parties' replies.  A jury trial resulted in a verdict in favor of ETMC.  Lexington
asserts that there is no legally sufficient evidence supporting jury findings for ETMC on any
of ETMC's claims.  For the reasons set out below, the Court finds that judgment should be
rendered in favor of Lexington and against ETMC on all claims.

### I. BACKGROUND AND PROCEDURAL HISTORY

The issues before this court concern a "claims-made" liability insurance policy
relating to Lexington's denial of ETMC's claim for coverage.[1]  The dispute centers around

---

[1] A claims-made policy covers an insured only for claims made during the policy
period regardless of when the covered acts or omissions occur.  *Matador Petroleum*

the notice and reporting requirements in a medical malpractice liability insurance policy issued by Lexington.  Specifically, the issues here confront whether ETMC properly brought an underlying lawsuit to the attention of Lexington and the degree to which strict compliance with the policy's reporting was required.

## A.    The Policy

Lexington issued a one-year, $5 million claims-made medical malpractice liability policy to ETMC (the "Lexington policy" or "policy").  The policy period began June 8, 2002 and ended June 8, 2003.  The policy provided excess liability insurance coverage whereby ETMC carried a self-insured retention ("SIR") of $2 million per claim.  ETMC also purchased excess policies from other insurers to cover claims exceeding Lexington's $5 million coverage layer.

Under ETMC's arrangement with its insurers, ETMC was the first link in its risk management chain. ETMC assumed responsibility for processing claims and monitoring all incidents potentially giving rise to medical malpractice claims ("medical incidents"). ETMC, in its discretion, could deny or settle any claim within its $2 million self-insured retention. If a lawsuit was filed on any claim, ETMC could retain counsel of its own choosing for its defense. When Lexington was notified of a claim by ETMC, Lexington would decide, in its

_____

*Corp. v. St. Paul Surplus Lines Ins. Co.*, 174 F.3d 653, 659 n.2 (5th Cir. 1999).  In contrast, an occurrence policy covers acts or omissions that occur within the policy period, regardless of whether the claims are brought to the attention of the insured  during the policy period. *Id*. (citing *Yancey v. Floyd West & Co.*, 755 S.W.2d 914, 918 (Tex. App.—Fort Worth 1988, writ denied)).

discretion, which claims it wished to investigate or handle as potential exposure to its coverage layer.

The pertinent parts of the policy in dispute relate to ETMC's notice responsibilities. If ETMC wanted excess coverage, ETMC was required to provide written notice to Lexington of medical incidents, claims or lawsuits[2] "as soon as practicable."  The focus at trial was on the latter two: notice of claim ("claim notice") and notice of lawsuit ("lawsuit notice").

In addition to claim notice and lawsuit notice, ETMC had a document reporting requirement for each. The policy required ETMC to "immediately" send Lexington copies of any demands, notices, summonses, or legal papers received in connection with a claim or lawsuit ("claim papers" and "suit papers").

**B.     The Underlying Claim**

In March 2003, ETMC received a medical malpractice claim in the form of a 4590i letter.[3]  The claim was on behalf of David Wayne Cornelius (the "Cornelius claim").  (Pl.'s Ex. 4.)  The letter indicated that Mr. Cornelius had suffered unspecified personal injuries at

---

[2] The policy refers to "suit." Throughout the opinion the words "suit" and "lawsuit" are used interchangeably.

[3] A "4590i letter" is a letter notifying a healthcare provider that an injured party is asserting a healthcare liability claim against the provider.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.051 (Vernon 2005).  A "4590i letter" must be submitted to the healthcare provider at least 60 days before the filing of a suit based on a healthcare liability claim.  *Id.*  The term "4590i letter" refers to the original location of this requirement in the Texas statutes, TEX. CIV. ST. ANN. art. 4590i, which has been repealed and recodified at TEX. CIV. PRAC. & REM. CODE ANN. § 74.001 et seq. (Vernon 2005).

ETMC's Athens, Texas facility.  Sometime during April 2003, ETMC entered information about the Cornelius claim on a computer-generated database or spreadsheet, which is referred to in the insurance industry as a "loss run."

A key dispute at trial was whether Lexington accepted loss runs as a form of claim notice. There was evidence that Lexington had acknowledged three other claims submitted in this manner. But Lexington showed no reaction to the Cornelius claim.  The loss run information for the Cornelius claim, including the notation about receipt of the 4590i letter, was provided to Lexington three times before the policy period ended on June 8, 2003.[4] By that time, neither the 4590i letter nor any other form of written claim notice or claim paper, had been given or sent to Lexington.

## C.     The Underlying Lawsuit

On May 27, 2003, Mr. Cornelius' mother filed a medical malpractice lawsuit on his behalf against ETMC in state court (the "Cornelius lawsuit").  ETMC assigned defense of the case to an attorney, who timely answered the Cornelius lawsuit on behalf of ETMC.

On June 8, 2003, the policy period expired.  At the time, ETMC did not consider the Cornelius lawsuit to be one that raised a high risk of potential exposure, nor did it believe that its liability for the claim would exceed its SIR or impact the Lexington policy coverage layer and those of other excess insurers.

---

[4] Loss runs typically included: the identification of the type of claim, the initial reserve and the status of each claim.

### D.    Notice of Claim and Lawsuit

Following depositions in December 2003, ETMC offered testimony that it realized for the first time that its liability for the lawsuit was likely to exceed ETMC's $2 million SIR. On January 15, 2004, seven months after the lawsuit was filed and seven months after the expiration of the policy period, ETMC first gave written notice of the lawsuit to Lexington and forwarded copies of claim and suit papers.  (Def.'s Ex. 8.)  On January 28, Lexington denied ETMC's claim asserting that ETMC had failed to comply with the Lexington policy's notice provisions.  (Pl.'s Ex. 10.)

### E.    This lawsuit

ETMC brought this lawsuit against Lexington and other insurers alleging causes of action arising from Lexington's denial of ETMC's claim in connection with the Cornelius lawsuit.[5]  ETMC's claims against Lexington included breach of contract, violation of the Texas Insurance Code, and negligent misrepresentation.  Lexington counter-claimed, alleging breach of contract, asking for a declaration of non-coverage under the Lexington policy, and seeking reimbursement for settlement of the underlying Cornelius lawsuit.[6]

Without submitting dispositive motions, the parties proceeded to trial. Before the case was submitted to the jury, Lexington abandoned its claims for declaratory judgment. A

---

[5] The other excess insurers are either no longer parties or proceedings have been stayed pending arbitration (Docket Entry Nos. 43, 47, 90).

[6] Prior to trial, ETMC,  Lexington, and Allied World Assurance Company, LTD, another of ETMC's excess insurers, settled the Cornelius malpractice lawsuit pursuant to a "Joint Funding Agreement."  (*See* Def.'s Ex. 67.)

verdict was returned in favor of ETMC as to all claims (Docket Entry No. 121). Both parties

have moved for judgment.

## II. STANDARD FOR RULE 50 MOTIONS

A court may grant judgment as a matter of law when "a party has been fully heard on

an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for

the party on that issue." FED. R. CIV. P. 50(a)(1). Because Lexington filed a motion for

judgment as a matter of law at the close of all evidence, it has preserved the right to file its

renewed judgment as a matter of law. FED. R. CIV. P. 50(b); *United States ex rel. Wallace*

*v. Flintco Inc.*, 143 F.3d 955, 960 (5th Cir. 1998).[7]

"In order to survive a Rule 50 motion . . . , the party opposing the motion must at least

establish a conflict in substantial evidence on each essential element of their claim." *Anthony*

*v. Chevron USA, Inc.*, 284 F.3d 578, 583 (5th Cir. 2002). That is, "the evidence must be

sufficient so that a jury will not ultimately rest its verdict on mere speculation and

conjecture." *Id.* When ascertaining whether there is sufficient evidence for the claims to be

submitted to the jury, a court must consider all the evidence presented at trial in the light

most favorable to the non-moving party and must disregard all evidence favorable to the

moving party that the jury is not required to believe. *Reeves v. Sanderson Plumbing*

---

[7] The Court pauses here to note that, while a district court is permitted to enter judgment as a matter of law during trial when it concludes that the evidence is legally insufficient, it is not required to do so. *Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 126 S. Ct. 980, 988 (2006). "To the contrary, the district courts are, if anything, encouraged to submit the case to the jury, rather than granting such motions." *Id.*

*Products, Inc.*, 530 U.S. 133, 150–51 (2000); *Ellis v. Weasler Engineering Inc.*, 258 F.3d 326, 337 (5th Cir. 2001) ("[C]ourt must give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" (quoting *Reeves*, 530 U.S. at 151)).

### III. ETMC'S BREACH OF CONTRACT CLAIM

The Jury answered interrogatories related to ETMC's breach of contract claim as follows:

1. Did ETMC fail to provide Lexington Insurance Company with written notice of the David Cornelius claim as soon as practicable? *No.*

2. The Court has found as a matter of law that ETMC failed to immediately send copies of the David Cornelius 4590i letter and lawsuit papers to Lexington Insurance Company. Was ETMC's failure to immediately send Lexington Insurance Company copies of the 4590i letter and the lawsuit papers excused? *Yes.*

Lexington argues that there is no evidence that ETMC complied with the insurance policy's conditions precedent to coverage. Specifically, Lexington argues, no record evidence exists that ETMC complied with the notice provisions of the insurance contract. As such, Lexington argues, its liability on the Cornelius claim was discharged and Lexington properly denied coverage.

A party seeking to recover for its breach of contract claim must first establish that it has performed its obligations that are conditions precedent under the contract. *See Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 283 (Tex. 1998) ("party seeking to recover under contract bears the burden of proving that all conditions precedent have been satisfied"); *Valero Marketing & Supply Co. v. Kalama Intern.*, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.)(finding that plaintiff's tendered performance is essential element of action for breach of contract). Also, providing notice as prescribed in an insurance policy is a condition precedent to coverage and an insured's failure to properly give notice discharges the insured's liability on the claim. *Klein v. Century Lloyds*, 154 Tex. 160, 275 S.W.2d 95, 97 (1955); *Matador Petroleum Corp. v. St. Paul Surplus Lines Ins. Co.*, 174 F.3d 653, 658 (5th Cir. 1999).

Construction of an insurance policy is a matter of law, so long as a court may fairly read it without ambiguity. *Texas Farm Bureau Mut. Ins. Co. v. Sturrock*, 146 S.W.3d 123, 126 (Tex. 2004). While ambiguities in the provisions of a policy must be construed against an insurer, *Nat'l Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991), a court should interpret the policy so as to avoid ambiguities and give effect to all its provisions. *Liberty Mut. Ins. Co. v. American Employers Ins. Co.*, 556 S.W.2d 242, 245 (Tex. 1977). Thus, the Court must first construe the policy language to determine the insured's notice obligations.

The provisions relevant to claims processing and corresponding duties are set out in Section V, where paragraphs C.1 and C.2 specify the relevant conditions precedent of the policy in this case:

C.     Duties In the Event Of A Claim, Suit, or Medical Incident

    1.     If, during the policy period, [ETMC] shall become aware of any Medical Incident which may reasonably be expected to give rise to a claim being made against any insured, [ETMC] must notify [Lexington] in writing as soon as practicable. To the extent possible, notice should include:

        a.     How, when, and where the medical incident took place;

        b.     The names and addresses of any injured persons and witnesses; and

        c.     The nature and location of any injury or damage arising out of the medical incident.

        . . . .

    2.     If a claim or suit is brought against [ETMC] arising out of a medical incident, [ETMC] must:

        a.     Immediately record the specifics of the claim or suit and the date received;

        b.     Provide [Lexington] with written notice of the claim or suit or [sic] as soon as practicable; and

        c.     Immediately send [Lexington] copies of any demands, notices, summonses, or legal papers received in connection with the claim or suit.

The clearly-stated purpose of subsection C is reflected in its heading, "Duties In the Event Of A Claim, Suit, or Medical Incident."  It reflects an intent to identify the insured's duties in the event of a medical incident, claim, or suit.  For example, paragraph C.2 tells ETMC what duties it will have in the event that a suit filed.  The provisions of subsection C describe three distinct events that require ETMC to act.

Likewise, paragraph C.2 describes three duties should a claim or suit be filed—recording, giving written notice of claim or suit, and sending claims or suit papers—which are mandatory, as shown by the word "must."  All three things must be done as shown by the conjunctive "and."  There is no indication that the insured is relieved of one duty because another has been performed or another event has occurred. For example, there is no statement to the effect that the insured is relieved of the duty to provide notice of a lawsuit simply because it has already notified the insurer of a claim or medical incident.  Nor does the language of the policy state in what order the duties must be performed.

ETMC suggests that compliance with the claim notice requirement is enough to trigger coverage under the policy and that once claim notice is given, ETMC need not establish lawsuit notice. In effect ETMC argues that construing the disjunctive term in the reference to "claim or suit" against Lexington indicates that the duty to give notice is for a "medical incident," or a "claim," or a "suit" and does not require that notice be given of a "medical incident" and later a "claim" and later a "suit."

A plain reading of the policy terms together does not yield those results. In construing the policy, subparagraph C.2.b ("claim notice" and "suit notice") can not be parsed, isolated or considered in a vacuum. The Texas Supreme Court has said that courts are

> bound to read all parts of a contract together to ascertain the agreement of the parties.  Thus, the policy must be considered as a whole.  Moreover, each part of the policy should be given effect.

*Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994) (citations omitted). Thus, the Court considers paragraph C.1 ("medical incidents") as also being relevant in interpreting the entire policy and understanding the progression of claims handling.  For example, a review of the duties set out in the event of a "medical incident" is instructive.  C.1 sets out ETMC's duties from the beginning by referring to "medical incidents."  Paragraph C.1 then sets out a system for identifying occurrences that have the potential to become a "claim" made or a "suit" filed against the insured.

That ETMC's responsibility extends to medical incidents, claims, and suits is demonstrated by paragraph C.1., which provides an independent notice requirement in the event of a "medical incident" and protects Lexington by allowing it to anticipate and investigate a potential claim or suit.  To say that ETMC had no further duty after complying with paragraph C.1 ("medical incident") to provide notice to an insurer once it became aware of the insured's claim would be inconsistent with the plain language of the policy.  There is no language that implies that compliance with paragraph C.1 ("medical incidents") releases

ETMC from complying with subparagraph C.2.b ("claim" or "suit").  Similarly, although ETMC's duties to Lexington are the same whether a claim is brought or a suit is filed, use of the disjunctive alone cannot fairly be read as a release from any future duty to provide notice of a lawsuit where notice of a claim has already been given.

This reading of the policy is bolstered by subparagraph C.2.c, which specifically and unequivocally imposes a duty on the insured to assist the insurer by "[i]mmediately send[ing] copies of any demands, notices, summonses, or legal papers received in connection with the claim or suit."[8]  Read in the context of the entire notice provision, subparagraph C.2.c demonstrates that the insured has a continuing duty to provide the insurer with the claim and lawsuit papers it receives in connection with an ongoing claim.

Not every medical incident for which an insured faces possible liability will result in filing a claim. Nor will every unresolved claim result in a lawsuit. Continuing notice requirements such as the ones reflected in paragraphs C.1 and C.2 acknowledge the fact that the insured is the party with primary access to the information necessary to give that notice at each of the three relevant stages.  Because the insured is the party in the best position to know when legal action has been taken against it, notifying the insurer of such action is similar in importance to but functionally different from providing notice of a medical

---

[8]As later discussed later, this paragraph provides an independent ground for finding that ETMC is to provide the Lexington with notice of a lawsuit.

incident or claim.[9] While the facts of this case indicate Lexington was aware of the intent to file the Cornelius lawsuit, the Court finds that this knowledge does not release ETMC from its obligations to provide notice once suit was filed.

Having construed the policy provisions and their interaction, the Court turns to the key conditions precedent for a legal sufficiency review. The Court will therefore consider whether ETMC  provided notice of the Cornelius claim and notice of the Cornelius suit "as soon as practicable," and whether ETMC "immediately" submitted copies of all "demands, notices, summonses, or legal papers" ("legal papers").

## A.      Notice of the Cornelius 4590i Claim Letter via Loss Run

As noted, ETMC must provide Lexington with "written notice" of the claim "as soon as practicable."[10]  The jury found in Question 1 of its verdict that ETMC had provided written notice of the Cornelius claim as soon as practicable when ETMC identified the Cornelius claim on its April 2003 loss run.  Lexington argues that a "loss run" does not

---

[9] Indeed, because the insured is the party in the best position to know when a claim or suit has been filed against it, insurance policies reasonably condition coverage on the insured's faithfully notifying the insurer of significant events, such as the filing of a lawsuit.  *See Harwell v. State Farm Mut. Auto. Ins. Co.*, 896 S.W.2d 170, 174 (Tex. 1995) (holding that notice to an insurer of a claim does not equate to actual knowledge of a suit against an insured); *Weaver v. Hartford Acc. & Indem. Co.*, 570 S.W.2d 367, 369 (Tex. 1978) (noting that an insurer does not have "the sentry duty of tracking back and forth to the court house to keep a check on if or when [the insured] may be served with process." (quoting *Campbell v. Continental Cas. Co.*, 170 F.2d 669, 671 (8th Cir. 1948))).

[10] Texas courts interpret "as soon as practicable" and "immediately" to mean "within a reasonable time under the circumstances."  *Continental Sav. Ass'n v. U.S. Fidelity and Guar. Co.*, 762 F.2d 1239, 1243 (5th Cir. 1985); *Commercial Standard Ins. Co. v. Harper*, 129 Tex. 249, 254, 103 S.W.2d 143, 146 (1937).

constitute acceptable "written notice" under the terms of the Lexington policy. But, at trial, the Court found that the contract failed to define or limit "written notice" and was therefore ambiguous as to whether a loss run constituted reasonable notice under the Lexington policy. Consequently, the Court admitted extraneous evidence of the parties' interpretation of the contract on this issue. *See National Union Fire Ins. Co. of Pittsburgh, PA v. CBI Industries, Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (noting that a court may admit extraneous evidence of parties' interpretation to determine true meaning of ambiguous instrument). Moreover, because the facts regarding Lexington's interpretation of the contract on this point were in dispute, the Court submitted this issue to the jury for a determination. *See McPherson v. St. Paul Fire & Marine Ins. Co.*, 350 F.2d 563, 566–67 (5th Cir. 1965) ("The question of whether notice is reasonable is usually a question of fact, but if the facts are undisputed, the question then becomes one of law.").

The Court finds that the evidence was sufficient to support the jury's finding that the April 2003 loss run was appropriate written notice of the 4590i claim letter under the Lexington policy. There was evidence at trial that Lexington requested periodic loss runs from ETMC and that it acknowledged notice of several claims that were submitted to Lexington solely via loss run.[11] In addition, the jury could have reasonably concluded, and

---

[11] As discussed in more detail later, ETMC's evidence reflected that Lexington acknowledged that it had been properly notified of three claims—identified as the "Bates," "Smith," and "Hudson" claims—that were submitted solely via loss run. (Pl.'s Ex. 36, 59, 60, 61.) There is some evidence that ETMC might have provided some additional notice as to the Hudson claim (*See* Pl.'s Ex. 183 at 4), but there was no evidence that ETMC had told Lexington of the Bates or Smith claims in any manner other than by loss run.

Lexington does not dispute, that the April 2003 loss run containing the Cornelius claim was submitted "as soon as practicable."[12]  Accordingly, the Court finds that there was sufficient evidence before the jury to support its finding in Question 1 that ETMC had provided written notice of the Cornelius claim as soon as practicable.

### B.    Notice of the Cornelius Lawsuit

The Lexington policy unambiguously states that, in the event of a *lawsuit*, ETMC must send written notice of the suit to Lexington "as soon as practicable."  It was undisputed and the evidence conclusively revealed that ETMC did not notify Lexington of the Cornelius suit until over *seven months after it was filed* and over seven months after the expiration of the policy.   As a matter of law, ETMC did not send notice of the suit "as soon as practicable."  *See McPherson*, 350 F.2d 563 (holding that notice sent 54 days after petition was filed was not "as soon as practicable"); *Assicurazioni Generali, SpA v. Pipe Line Valve Specialties Co., Inc.*, 935 F. Supp. 879, 888 (S.D. Tex. 1996) (holding that notice sent two months after a petition was filed was not notice "as soon as practicable"); *Klein v. Century Lloyds*, 154 Tex. 160, 275 S.W.2d 95, 97 (1955) (holding that notice sent 32 days after an accident was not "as soon as practicable").

ETMC's untimely notice of the suit constitutes a breach or failure to perform a condition precedent to coverage under the Lexington policy, relieving Lexington of any

---

[12] It was not clear from the evidence exactly when ETMC sent the April 2003 loss run to Lexington.  Because the Cornelius 4590i claim letter was received on March 27, 2003, however, the loss run may have been submitted as soon as five days from the date the letter was received.

obligation to defend or indemnify ETMC for the Cornelius claim.  *See Matador*, 174 F.3d

at 658 (noting that an insurer may deny coverage for deficient notice of a claim); *McPherson*,

350 F.2d at 566 (noting that failure to give proper notice may constitute a breach of contract

that relieves an insurer of the obligation to defend or indemnify the insured).  Nevertheless,

ETMC argues that its breach is excused because Lexington did not prove that it was

prejudiced by ETMC's late notice and because Lexington had waived notice of the suit.

### C.    Forwarding Copies of Claim Papers and Lawsuit Papers

The Lexington policy requires that ETMC "immediately" send Lexington "copies of

any demands, notices, summonses, or legal papers received in connection with the claim or

suit."  It was undisputed, and the Court instructed the jury, that ETMC failed to send copies

of the Cornelius 4590i letter and other legal papers immediately.  The jury found in Question

2 of its verdict, however, that Lexington had waived this requirement by virtue of

Lexington's conduct. A detailed discussion of the implications of this finding is given later.

### D.    Prejudice

At trial, ETMC argued that Lexington must show that it was prejudiced by ETMC's

late notice before it may deny the Cornelius claim.  The Court declined to submit a question

on prejudice to the jury, however, because Texas law does not require an insurer to show that

it was prejudiced before denying coverage for untimely notice when the policy at issue is a

"claims-made" policy.  *See Matador*, 174 F.3d at 658–59 (citing *Komatsu v. United States

Fire Ins. Co.*, 806 S.W.2d 603, 607 (Tex. App.—Fort Worth 1991, writ denied)); *Hirsch v.*

*Texas Lawyers' Ins. Exch.*, 808 S.W.2d 561, 565 (Tex. App.—El Paso 1991, writ denied)

("To require a showing of prejudice for late notice would defeat the purpose of 'claims-

made' policies, and in effect, change such a policy into an 'occurrence' policy.").  This rule

is different from the rule for "occurrence" policies, under which an insurer must show it was

prejudiced by untimely notice before it may deny coverage.  *See Hirsch*, 808 S.W.2d at 562

(noting that insurer must show prejudice under "occurrence" policies).  Unlike "occurrence"

policies, courts strictly interpret notice provisions in "claims-made" policies to give effect

to the beneficial bargain that each party receives from more limited coverage.[13]  *See Matador*,

174 F.3d at 659–60; *Komatzu*, 806 S.W.2d at 607 (noting reasons why claims-made policy

notice provisions should be given strict effect); *Yancey v. Floyd West & Co.*, 755 S.W.2d

914, 923 (Tex. App.—Fort Worth 1988, writ denied) (comparing "occurrence" and "claims-

made" policies and noting advantages offered by the latter).  As explained by the Fifth

Circuit in *Matador*, the notice provision in a "claims-made" policy is an element of the

covered risk, and to require an insurer to prove prejudice from untimely notice could result

in an unbargained for expansion of coverage.  *Matador*, 174 F.3d at 659; *see Komatzu*, 806

---

[13] "Claims-made" policies are accorded this strict treatment because, under a "claims-made" policy, an insurer has the assurance of knowing that its liability is restricted to claims filed within a certain period of time and that it will receive notice of the claim in a prompt manner, enabling the insurer to know its potential liabilities for any given policy period with a degree of exactitude.  *See Yancey v. Floyd West & Co.*, 755 S.W.2d 914, 923 (Tex. App.—Fort Worth 1988, writ denied).  In return, an insured receives a lower premium for the policy and more readily-available insurance.  *See id*.; *Komatsu*, 806 S.W.2d at 607.

S.W.2d at 607 ("Extension of the notice period in a claims-made policy constitutes an unbargained for expansion of coverage.")

Nevertheless, ETMC argues that the Lexington policy should be distinguished from the "claims-made" policies discussed in *Matador*, *Komatsu*, *Yancey*, and *Hirsch*, because the insurance policies discussed in those cases required that claims be made *and reported* during the policy period.  In contrast, argues ETMC, the Lexington policy requires only that a claim be made during the policy period, and leaves open the possibility that notice may be sent after the expiration of the policy period.  ETMC concludes, therefore, that the notice provision in the Lexington policy is not an element of the covered risk and should not be treated as such.[14]

A review of  Texas and Fifth Circuit cases applying Texas law, however, reveals no indication that Texas courts have recognized or are likely to recognize ETMC's suggested distinction.  Indeed, the Fifth Circuit rejected a similar argument in *Federal Insurance Co. v. CompUSA, Inc.*, 319 F.3d 746, 754 (5th Cir. 2003).  In *CompUSA*, the insured argued that

---

[14] In support of its argument that the Lexington policy should not be afforded the same treatment as those "claims made and reported" policies discussed in the *Matador* line of cases, ETMC cites *Maynard v. Westport Ins. Corp.*, in which the United States District Court for the District of Maryland determined that only "claims made and reported" policies—and not simple "claims-made" policies—should be exempt from a Maryland statute requiring "actual prejudice" to deny a claim for late notice.  208 F. Supp. 2d 568, 574 (D. Md. 2002).  The *Maynard* court was applying Maryland state case law interpreting a Maryland statutory rule.  *Id*. at 574 (citing MD. CODE ANN., INS. § 19-110; *St. Paul Fire & Marine Ins. Co. v. House*, 554 A.2d 404 (Md. 1989); *T.H.E. Ins. Co. v. P.T.P. Inc.*, 628 A.2d 223 (Md. 1993)).  Texas law, however, has never recognized ETMC's proposed distinction.  Though a Maryland court's analysis interpreting a Maryland statute is informative, the task of this court is to apply Texas law as established by the Texas Supreme Court and, if the Supreme Court hasn't ruled on the issue in question, to determine, to the best of this court's ability, what the Texas Supreme Court would decide.  *See United Teacher Associates Ins. Co. v. Union Labor Life Ins. Co.*, 414 F.3d 558, 565–566 (5th Cir. 2005).

the insurer should have to prove that it was prejudiced by late notice before denying coverage under the "claims-made" policy at issue because the policy extended the claims reporting period beyond the policy term, which the insured argued converted the policy into an "occurrence" policy.  *Id*. at 750.  In rejecting this argument, the Fifth Circuit adopted the analysis of the district court, which had concluded that, under the policy's plain language, the coverage was written on a "claims-made" basis, and this basic feature of the policy is not disturbed simply because the policy allows for a lengthened claims-reporting period.  *Id*. at 755.

In this case, the first page of the Lexington "Excess Healthcare Professional Liablity *Claims Made* Coverage Part" states that "*THIS COVERAGE PART PROVIDES CLAIMS MADE COVERAGE ONLY*.  COVERAGE IS LIMITED TO LIABILITY FOR *CLAIMS FIRST MADE* AGAINST AN INSURED *DURING THE POLICY PERIOD* OR AN EXTENDED REPORTING PERIOD, IF APPLICABLE."  (Pl.'s Ex. 38 at 6 (emphasis added).)  The next paragraph states, in part, that: "[a] claim for a medical incident must be *first made against the Insured during the policy period*."  (Id. (emphasis added).)  The Lexington policy's coverage is clearly written on a "claims-made" basis and none other.

Though the Lexington policy does not demand notice of a claim or suit during the policy period, the window available for furnishing notice is not infinite and is governed by the judicial interpretation of "as soon as practicable."  Just as in *CompUSA*, the Lexington policy provides that Lexington will receive notice of a claim or suit within a reasonable time

after the termination of the policy period.  And in congruence with the policy rationale discussed in *Matador*, the Lexington "claims-made" policy enables Lexington to know its potential costs and liabilities within a short period of time after the policy period has expired.[15]  To require coverage under a claims-made policy where the insurer is not notified of a lawsuit until over seven months after the policy expires would unquestionably expand the risks covered and undermine or destroy the benefits of the claims-made coverage.

Consistent with Texas and Fifth Circuit law governing claims-made policies, the Court declines to impose a duty on Lexington to show prejudice for untimely notice of the Cornelius suit.

###### E.     Waiver

####### 1.     *Waiver of Lawsuit Notice*

ETMC also argued at trial that Lexington had waived enforcement of the notice provision.  The Court did not submit a question on waiver of notice of suit, however, because first, waiver is not a valid defense, and second, there was no evidence that Lexington had waived the notice requirement.

Under Texas law,  an insurance company may waive by its conduct a condition precedent to performance on an insurance policy.  *Equitable Life Assur. Society of the United*

---

[15] Indeed, because ETMC must notify Lexington of a claim or suit within a reasonable time after a claim or suit is filed, and not simply within the policy period, the Lexington policy's notice requirement is possibly *more strict* than that of a typical "claims made and reported" policy—i.e., if a claim or suit were filed early in the policy term, notice would likely be due well before the policy expires.  *See, e.g., McPherson*, 350 F.2d 563 (holding that notice sent 54 days after petition was filed was not notice "as soon as practicable").

*States v. Ellis*, 105 Tex. 526, 147 S.W. 1152 (1912); *see Matador*, 174 F.3d at 660.  Waiver results from "either the 'intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right.'"  *In re General Elec. Capital Corp.*, 203 S.W.3d 314, 316 (Tex. 2006) (quoting *Sun Exploration & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987)).  Waiver is not a valid defense, however, if its application would enlarge the risks covered by an insurance policy.  *Matador*, 174 F.3d at 660 (citing *The Minnesota Mutual Life Ins. Co. v. Morse*, 487 S.W.2d 317, 320 (Tex. 1972); *Texas Farmers Ins. Co. v. McGuire*, 744 S.W.2d 601, 603 (Tex. 1988)).  Because courts view notice provisions in "claims-made" policies as an element of the covered risk and as an integral part of the bargained-for coverage, waiver is not an available defense to deficient notice under claims-made policies. *See Matador*, 174 F.3d at 660–61.

Nevertheless, even if waiver were a valid defense to late notice of the suit, there is no evidence to support waiver of notice in this case.  With respect to waiver by conduct, the Texas Supreme court has stated that,

> for implied waiver to be found through a party's actions, intent must be clearly demonstrated by the surrounding facts and circumstances.  *There can be no waiver of a right if the person sought to be charged with waiver says or does nothing inconsistent with an intent to rely upon such right.*

*Jernigan v. Langley*, 111 S.W.3d 153, 156–57 (Tex. 2003) (citations omitted) (emphasis added).  "While waiver may sometimes be established by conduct, that conduct must be

*unequivocally inconsistent* with claiming a known right." *Van Indep. Sch. Dist. v. McCarty*,

165 S.W.3d 351, 353 (Tex. 2005) (emphasis added).

In this case, there is no evidence that Lexington engaged in conduct inconsistent with

its right to be notified of a suit as soon as practicable.  As noted previously, ETMC

introduced evidence at trial tending to indicate that Lexington considered a loss run to be

sufficient notice of a claim.  Specifically, ETMC introduced evidence that ETMC submitted

three claims *solely* via loss run—the "Bates," "Smith," and "Hudson" claims—and that

Lexington responded by acknowledging receipt of notice on those claims in three letters

dated June 9, 2003.  (Pl.'s Ex. 36, 59, 60, 61.)  In the Bates, Smith, and Hudson

acknowledgment letters, Lexington asked ETMC to forward relevant portions of each

individual claimant's medical records and hospital charts, and requested that ETMC send

Lexington carbon copies of all correspondence so that Lexington could monitor the claims

for exposure.  While this conduct may be inconsistent with Lexington's right to demand that

ETMC immediately forward legal papers,[16] it is not inconsistent with Lexington's right to

receive written notice of a lawsuit as soon as practicable.  ETMC provided no other evidence

that Lexington may have said or done anything demonstrating an intent to waive notice of

a *lawsuit*, and the Court properly declined to submit such a question to the jury.

---

[16] The Court will further discuss waiver of the requirement that ETMC immediately send
copies of the 4590i letter or lawsuit papers in the next section.

### 2.   *Waiver of Forwarding Claim and Lawsuit Papers*

As noted, the jury found in Question 2 that Lexington had waived the requirement that ETMC immediately send Lexington copies of claim and lawsuit papers by virtue of Lexington's conduct.[17]

Because ETMC's duty to immediately send copies of legal papers is a requirement distinct from sending written notice of a claim or suit, this duty may be waived by Lexington. *See Equitable Life*, 105 Tex. 526, 147 S.W. 1152 (holding that conditions precedent to coverage may be waived by insurer); *Matador*, 174 F.3d at 660 (holding that *notice requirements* in claims-made policies are not subject to waiver).  Here, Lexington's Bates, Smith, and Hudson acknowledgment letters asked ETMC to forward copies of certain medical records and correspondence with counsel, but failed to request any legal documents related to the reported claim.  The Court finds that this evidence, when viewed in a light most favorable to ETMC, supports a finding that Lexington may have waived this requirement. Nevertheless, in this instance the jury's affirmative waiver finding has no impact on the outcome of ETMC's breach of contract claim because ETMC failed to timely notify Lexington of the Cornelius lawsuit, a condition precedent that could not be waived.

---

[17] The court's definition of waiver in Question 2 of the verdict form stated: "Waiver occurs when (1) the insurer waived by its conduct the enforcement of a particular policy provision, (2) the insured relied to its detriment on the insurer's conduct, and (3) it would be unjust to allow the insurer to enforce the policy provision under the given circumstances." (Docket Entry No. 121 at 2.)  Neither party objected to the form or substance of this definition.

### F.   Lexington Properly Denied Coverage

Because ETMC did not provide written notice to Lexington of the Cornelius lawsuit until over seven months after it was filed, ETMC failed to comply with a condition precedent to coverage under the Lexington policy.   Accordingly, Lexington did not breach the insurance contract by denying coverage for the Cornelius claim and Lexington is entitled to judgment on ETMC's contract claim as a matter of law.

## IV.  ETMC'S TEXAS INSURANCE CODE CLAIMS

The jury answered the following questions pertaining to ETMC's Texas Insurance Code claims as follows:

3.   Did Lexington Insurance Company engage in any unfair or deceptive act or practice that was a producing cause of damages to ETMC?

"Unfair or deceptive act or practice" means any of the following:

a.   Failing to state a material fact relating to the Lexington policy that was necessary to make other statements made not misleading, considering the circumstances under which the statement were made.  *Yes.*

b.   Making a statement in relation to the Lexington policy in a manner that would mislead a reasonably prudent person to false conclusion of a material fact.  *Yes.*

4.      Did  Lexington  Insurance  Company  engage  in  any such conduct
knowingly?  *Yes.*

Lexington argues that there is no evidence to support the jury's finding that it made
a material misrepresentation to ETMC, nor is there any evidence that ETMC was injured by
any such misrepresentation.

ETMC's claim for improper denial of coverage for the Cornelius claim cannot be the
basis for a violation of the Texas Insurance Code.  *See Lundstrom v. United Services Auto.
Ass'n-CIC*, 192 S.W.3d 78, 96–97 (Tex. App.—Houston [14th Dist.] 2006, pet. denied)
(there can be no Texas Insurance Code violation for an unfair or deceptive practice when the
alleged unfair practice is that the insurer denied a claim that is, in fact, not covered under the
policy); *Crawford v. Ace Sign*, 917 S.W.2d 12, 14 (Tex. 1996) ("An allegation of a mere
breach of contract, without more, does not constitute a 'false, misleading or deceptive act.'").
Accordingly,  ETMC  must  have  produced  evidence  of  a  misrepresentation  apart  from
Lexington's denial of the Cornelius claim.

## A.      Evidence That Lexington Made a Misrepresentation

ETMC argues that Lexington represented to ETMC in its January 28, 2004 coverage
denial letter that Lexington denies claims unless the insured strictly complies with the
insurance policy's notice requirements.  ETMC says this is false because Lexington's prior
conduct illustrates that it does not, in fact, require strict compliance with a policy's notice
provisions.  (Pl.'s Response to Motion for Judgment as a Matter of Law, Doc. No. 133, at

16.)  ETMC argues that Lexington "cherry picked" untimely notice as a reason to deny a

claim that it would have otherwise been obligated to pay.

The Court, however, finds no evidence of such a misrepresentation.  Lexington's

January 28, 2004 denial letter states that Lexington is denying the Cornelius claim "[b]ecause

ETMC did not report the lawsuit as soon as practicable, and did not immediately send us

copies of the suit papers after they were served in May, 2003."  (Pl.'s Ex. 10 at 7.)  At trial,

ETMC produced no evidence that Lexington's statement is untrue or misleading.  ETMC *did*

produce evidence that Lexington acknowledged having received notice of claims and

lawsuits even though ETMC had not also forwarded copies of legal papers.  The specific

evidence related to these claims—the "Bates," "Smith," and "Hudson" claims—does not,

however, indicate that Lexington ever promised to extend coverage for any of these claims

or that it actually did pay on these claims.  Lexington merely acknowledged receipt of

specific notice of these claims or suits.

Neither did Lexington's Bates, Smith, and Hudson acknowledgment letters represent

that ETMC had met *all* conditions precedent to coverage under the policy.  Indeed, the Bates,

Smith, and Hudson acknowledgment letters request further and continuing communication

from ETMC about the status of the claim or suit.  The Bates, Smith, and Hudson letters are

not inconsistent with Lexington's basis for denying the Cornelius claim as stated in its

January 28, 2004 letter.  ETMC's evidence is therefore insufficient evidence of an actionable

misrepresentation under the Texas Insurance Code.

### B.      Evidence of Cause of Damage to ETMC

Nevertheless, even if Lexington's January 28, 2004 denial letter contained a misrepresentation, there is no evidence that the letter actually caused any damage to ETMC. To recover under the Texas Insurance Code, a plaintiff must prove that the defendant's misrepresentation was a cause-in-fact of the plaintiff's actual damages. *Blanchard v. State Farm Lloyds*, 206 F. Supp. 2d 840, 847 (S.D. Tex. 2001) (citing *Provident Am. Ins. Co. v. Castaneda*, 988 S.W.2d 189, 192 (Tex. 1998)).

The only damage that can be said to have resulted from Lexington's January 28, 2004 denial letter are the damages attributable to ETMC's own failure to provide timely notice of the Cornelius lawsuit. ETMC's own breach of contract in failing to give lawsuit notice, and not the January 28, 2004 letter, was the producing cause of ETMC's damages. There was no other evidence of damage resulting from the January 28, 2004 claim denial letter.

### C.      ETMC Has Not Established its Texas Insurance Code Claim

Accordingly, ETMC failed to produce sufficient evidence to support its claim for breach of the Texas Insurance Code and Lexington is entitled to judgment on this claim as a matter of law.

### V.  ETMC'S NEGLIGENT MISREPRESENTATION CLAIM

The jury answered the following question as to Lexington's liability for negligent representation:

8.    Did    Lexington    Insurance    Company    make    any    negligent misrepresentation to ETMC in connection with the denial of the David Cornelius claim on which ETMC justifiably relied and that was the proximate cause of damages to ETMC? *Yes.*

To establish a claim of negligent misrepresentation, a plaintiff must establish the following: (1) a representation is made by the defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation. *Federal Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991).

ETMC argues that, if Lexington's January 28, 2004 misrepresentation is not a knowing misrepresentation, it at least amounts to a negligent misrepresentation.  As discussed above, however, there is insufficient evidence to show that Lexington actually made a misrepresentation in its January 28, 2004 denial letter.

Moreover, there is insufficient evidence that any misrepresentation caused a pecuniary loss to ETMC beyond the denial of the Cornelius claim.

Lexington is therefore entitled to judgment as a matter of law on ETMC's claim for negligent misrepresentation.

## VI.  ETMC'S DAMAGE AWARDS

Because the Court finds that, as a matter of law, judgment as to all of ETMC's claims should be granted in favor of Lexington, the Court finds that the jury's award of damages in Questions 5 and 9 should be vacated and that ETMC should take nothing.

## VII.  LEXINGTON'S BREACH OF CONTRACT CLAIM

Because ETMC did not send timely notice of the Cornelius suit, the Court finds that ETMC breached the conditions precedent to coverage under the Lexington policy. Therefore, there is no coverage for the Cornelius claim under the Lexington policy and Lexington is entitled to recover its damages in the amount of $2.5 million, Lexington's portion of the parties' funding agreement.[18]  (Def.'s Ex. 67.)

## VIII.  CONCLUSION

For the above stated reasons, the Court finds that judgment as a matter of law should be entered in favor of Lexington on all of ETMC's claims, and that judgment should be entered in favor of Lexington as to its own claims for beach of contract and for damages.  It is therefore

---

[18] Under the"Joint Funding Agreement" that settled the Cornelius lawsuit, Lexington contributed $2.5 million to the Cornelius settlement and reserved the right to seek reimbursement from ETMC in another action.  (Def.'s Ex. 67.)  Lexington is pursuing its rights under the Joint Funding Agreement in this action.

**ORDERED** that within ten days of the entry of this order, Lexington shall file a proposed judgment that conforms with the Court's findings and conclusions as stated in this opinion.

**It is SO ORDERED.**

**SIGNED this 12th day of July, 2007.**


_____
MICHAEL H. SCHNEIDER
UNITED STATES DISTRICT JUDGE