**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| EAST TEXAS MEDICAL CENTER | § | |
| REGIONAL HEALTHCARE SYSTEM, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 6:04-CV-165 |
| | § | |
| LEXINGTON INSURANCE | § | |
| COMPANY; ALLIED WORLD | § | |
| ASSURANCE COMPANY, LTD; | § | |
| AND STEADFAST INSURANCE | § | |
| COMPANY, | § | |

## MEMORANDUM OPINION AND ORDER

This insurance dispute arises out of an excess medical malpractice policy issued by Defendant Lexington Insurance Company ("Lexington") to Plaintiff East Texas Medical Center Regional Healthcare System ("ETMC" or "hospital"). Lexington denied a multi-million dollar claim filed by ETMC after the hospital breached two of the policy's three notice provisions in connection with the claim and underlying lawsuit. ETMC then filed this suit.

Both parties moved for summary judgment (ETMC in Doc. No.203 and Lexington in Doc. No. 205). After considering the parties' briefing, oral argument, and the applicable law, the Court denied Lexington's motion (Doc. No. 243) and granted ETMC's Motion for Partial Summary Judgment (Doc. No. 255). The Court now enters this Memorandum Opinion and Order setting forth its reasons for those decisions.

### I. Background

This coverage dispute centers around the notice and reporting requirements in a medical malpractice liability insurance policy issued by Lexington. Specifically, the issues here confront

whether ETMC's failure to timely notify Lexington about an underlying lawsuit,[1] the suit that was the basis for the malpractice claim against the hospital, prejudiced Lexington to the degree that justified Lexington's denial of coverage.

### A.    The Policy

Lexington issued a medical malpractice liability policy to ETMC (the "Lexington policy" or "policy"). The policy period began June 8, 2002 and ended June 8, 2003. The policy provided excess liability insurance coverage whereby ETMC carried a self-insured retention ("SIR") of $2 million per claim.[2] ETMC also purchased excess policies from other insurers to cover claims exceeding Lexington's $5 million coverage layer.

Under ETMC's arrangement with its insurers, ETMC was the first link in its risk management chain. ETMC assumed responsibility for processing claims and monitoring all incidents potentially giving rise to medical malpractice claims ("medical incidents"). ETMC, in its discretion, could deny or settle any claim within its $2 million SIR. If a lawsuit was filed on any claim, ETMC could retain counsel of its own choosing for its defense. The policy gave Lexington the right to participate in the defense of any lawsuit against ETMC that might implicate Lexington's coverage. But Lexington was not bound to provide a defense until ETMC exhausted its SIR.

The pertinent parts of the policy in dispute relate to ETMC's notice responsibilities. To obtain excess coverage, ETMC was required to provide written notice to Lexington of medical incidents, claims, or lawsuits "as soon as practicable."

---

[1] The policy refers to "suit." Throughout the opinion the words "suit" and "lawsuit" are used interchangeably

[2] The parties now dispute whether the SIR is $2 million or $2.1 million. However, this dispute exceeds the scope of this opinion as damages will be addressed at a later time.

In addition to claim notice and lawsuit notice, ETMC had a document reporting requirement for each. The policy required ETMC to "immediately" send Lexington copies of any demands, notices, summonses, or legal papers received in connection with a claim or lawsuit ("legal papers").

## B.  The Underlying Claim

In March 2003, ETMC received a medical malpractice claim on behalf of David Wayne Cornelius (the "Cornelius claim") indicating that Mr. Cornelius had suffered unspecified personal injuries at an ETMC hospital. Then, in April 2003, ETMC forwarded information about the Cornelius claim to Lexington, but failed to send documents underlying the claim.

## C.  The Underlying Lawsuit

On May 27, 2003, about two weeks before the policy expired, Mr. Cornelius's mother filed a medical malpractice lawsuit on his behalf against ETMC in state court (the "Cornelius lawsuit"). ETMC assigned defense of the case to an attorney, who timely answered the Cornelius lawsuit on behalf of ETMC.

In December 2003, the plaintiff in the Cornelius lawsuit took depositions of three treating nurses and a respiratory therapist (collectively, the "nurses"). The nurses admitted negligence during their depositions.

## D.  Notice of Claim and Lawsuit

On January 15, 2004, nearly eight months after the lawsuit was filed and seven months after the expiration of the policy period, ETMC first gave written notice of the lawsuit to Lexington and forwarded copies of the legal papers related to the claim and lawsuit (Pl.'s Mot. Partial Summ. J. Ex. 1-B, Doc. No. 203-2). On January 28, Lexington denied ETMC's claim asserting that ETMC had failed to comply with the policy's notice provisions (Pl.'s Mot. Partial Summ. J. Ex. 1-C, Doc. No.

203-2). It is undisputed that ETMC failed to provide written notice of the Cornelius lawsuit "as soon as practicable" nor did ETMC "immediately" send Lexington copies of any legal papers.

On April 19, 2004, three months after ETMC gave the notices required under the policy, the trial court in the Cornelius lawsuit entered a partial summary judgement as to ETMC's negligence. Then, on August 12, 2004, the trial court entered another partial summary judgment finding that ETMC's negligence had proximately caused Mr. Cornelius' damages. The parties settled the Cornelius lawsuit in February 2005, approximately one year after Lexington had received all the relevant information and documentation required under the policy.

### E.    This Lawsuit

ETMC brought this lawsuit against Lexington and other insurers because Lexington denied ETMC's claim.[3] Lexington counter-claimed, alleging breach of contract, and sought reimbursement for settlement of the underlying Cornelius lawsuit.[4]

The parties proceeded to trial. Over ETMC's objection, the question of prejudice to Lexington due to late notice was not submitted to the jury. A verdict was returned in favor of ETMC as to all claims. Following trial, this Court overturned the jury verdict and granted Lexington's Renewed Motion for Judgment as a Matter of Law.

### F. The Appeal and Remand

ETMC timely appealed. The Fifth Circuit reversed this Court, holding that Lexington had to

---

[3] The other excess insurers are either no longer parties or proceedings have been stayed pending arbitration (Doc. Nos. 43, 47, 90).

[4] Prior to trial, ETMC, Lexington, and other excess insurers of layers above Lexington's coverage, settled the Cornelius malpractice lawsuit pursuant to a "Joint Funding Agreement" (Def.'s Mot. Summ. J. Ex. 33, Doc. No. 205-34).

prove it was prejudiced by ETMC's breach of the policy's notice provisions to avoid its payment obligation. *E. Tex. Med. Ctr. Reg'l Healthcare Sys. v. Lexington Ins. Co.*, 575 F.3d 520, 532 (5th Cir. 2009). Thus, the case was remanded to consider that discrete issue.[5]

Following remand, both parties filed motions for summary judgment[6] (Doc. Nos. 203 and 205). The Court denied Lexington's Motion (Doc. No. 243) and granted ETMC's Motion for Partial Summary Judgment on November 3, 2010 (Doc. No. 255).

## II.    Standard

The Court should grant a motion for summary judgment if no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Norwegian Bulk Transp. A/S v. Int'l Marine*

---

[5]The court notes that the policy at issue here is a "claims-made" rather than an "occurrence" policy. "[A] claims-made policy covers the insured only 'for claims made during the policy [period] . . . regardless of when the covered act or omission occured.'" *Matador Petroleum Corp. v. Saint Paul Surplus Lines Ins. Co.*, 174 F.3d 653, 658 n.2 (5th Cir. 1999) (quoting *Nat'l Union Fire Ins. Co. v. Talcott*, 931 F.2d 166, 168 n.3 (1st Cir. 1991)). In contrast, an occurrence policy covers acts or omissions that occur within the policy period, regardless of when the claims are brought to the attention of the insured. *Id.* (quoting *Yancey v. Floyd W. & Co.*, 755 S.W.2d 914, 918 (Tex. App.—Fort Worth 1988, writ denied)). An insurer must show that prejudice accompanied untimely notice under an occurrence policy because "the notice requirement is subsidiary to the event that triggers coverage." *PAJ, Inc. v. Hanover Ins. Co.*, 243 S.W.3d 630, 636 (Tex. 2008) (quoting *Matador Petroleum*, 174 F.3d at 658). At the time of trial in 2006, Texas did not require proof of prejudice following breach of a claims-made policy. *Id.* at 659. But Texas now applies the notice-prejudice rule to claims-made policies as well. *Prodigy Commc'ns Corp. v. Agric. Excess & Surplus Ins. Co*, 288 S.W.3d 374, 382 (Tex. 2009). In contrast, a "claims-made and reported" policy requires notice to the insurer within a specified time. *E. Tex. Med. Ctr.*, 575 F.3d at 528. If the insured does not comply with the cut-off in a claims-made and reported policy, then prejudice is not required to avoid payment. *Prodigy Commc'ns Corp.*, 288 S.W.3d at 382 (adopting the reasoning in *T.H.E. Ins. Co. v. P.T.P. Inc.*, 628 A.2d 223, 227–28 (Md. 1993)).

[6]ETMC filed a motion for partial summary judgment, leaving unresolved the issue of damages. The parties stipulated at the pretrial conference that the Court will resolve legal and factual questions related to damages at a later time on the submissions of the parties.

*Terminals P'ship*, 520 F.3d 409, 411 (5th Cir. 2008). A fact is material if it might affect the outcome of the suit under the governing law. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009). Issues of material fact are "genuine" only if they require resolution by a trier of fact and if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Sossamon*, 560 F.3d at 326. When ruling on a motion for summary judgment, the Court must view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Sossamon*, 560 F.3d at 326.

Under Rule 56, the party moving for summary judgment must "demonstrate the absence of a genuine issue of material fact." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010) (quotation omitted). If the moving party fails to meet this initial burden, the motion must be denied regardless of the nonmovant's response. *Id.* (quotation omitted). If the movant meets the burden, however, Rule 56 requires the opposing party to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. *Anderson*, 477 U.S. at 256; *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 337 (5th Cir. 2008); *EEOC v. Tex. Instruments, Inc.*, 100 F.3d 1173, 1180 (5th Cir. 1996).The nonmovant's burden may not be satisfied by argument, conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a mere scintilla of evidence. *Matsushita*, 475 U.S. at 585–86; *U.S. ex rel. Farmer*, 523 F.3d at 337; *Duffie*, 600 F.3d at 371.

### III.     The Texas Notice-Prejudice Rule

This opinion considers whether Lexington suffered prejudice from (1) ETMC's failure to

notify Lexington of the Cornelius lawsuit as soon as practicable; (2) ETMC's delay in immediately

forwarding the legal papers; or (3) both (i.e., delayed lawsuit notice and forwarding legal papers). [7]

An insured's untimely notice does not excuse the insurer from its payment obligation under the policy

absent a showing of prejudice. Whether an insurer has suffered prejudice is typically a question of

fact. *Coastal Ref. & Mktg., Inc. v. U.S. Fid. & Guar. Co.*, 218 S.W.3d 279, 287 (Tex.App.—Houston

[14th Dist.] 2007, pet. denied). But when an insurer fails to present sufficient evidence of prejudice,

the Court may grant summary judgment in favor of the insured. *See, e.g.*, *Travelers Indem. Co. of

Conn. v. Presbyterian Healthcare Res.*, No. 3:02-CV-1881-P, 2004 WL 389090, at *9–10 (N.D. Tex.

Feb. 24, 2004).

### A. The Parties' Contentions

Lexington claims that its burden to show prejudice is satisfied because it lost a substantial

right: the right to participate. Pursuant to Lexington's argument, Lexington's lost right to participate

in ETMC's defense in the Cornelius lawsuit amounts to prejudice as a matter of law, similar to a

default judgment. Lexington also stresses that it has been prejudiced if it shows "a material change

in the posture of the underlying case." Lexington claims that such a change occurred in December

2003 following the nurses' depositions. Finally, Lexington also argues that its summary judgment

evidence establishes a fact issue on whether Lexington suffered prejudice.

ETMC counters that the right to participate—even if abridged due to untimely notice—could

never establish prejudice. ETMC insists that the right to participate only provides access to

information regarding the underlying lawsuit. In other words, ETMC believes that Lexington's lost

right to participate had little to no value, and thus its loss inflicted no harm on Lexington.

---

[7] As noted above, the Court will evaluate damages following additional briefing.

Alternatively, ETMC argues that there is insufficient evidence to support a finding of prejudice.

## B. The Evolving Prejudice Standard

Although "prejudice" is not easily defined, *see, e.g. Coastal Ref.,* 218 S.W.3d at 287, Texas courts seem willing to accept a narrow definition. *Trumble Steel Erectors, Inc. v. Moss*, 304 F. App'x 236, 240 (5th Cir. 2008). This opinion looks to the broad policy principles set forth by the courts, the history behind the rule, and specific examples drawn from caselaw to discern the contours of the Texas prejudice rule.

Citing Texas law, the Fifth Circuit has said that "'[p]rejudice' is the loss of a valuable right or benefit" and that prejudice occurs when the insurer suffers a material adverse change in position due to the breach. *Trumble Steel*, 304 F. App'x at 239*; Coastal Ref.,* 218 S.W.3d at 288 ("[A]n insurer must demonstrate a material change in position to establish prejudice."). The loss of a right with no demonstrated value does not prejudice the insurer. *Clarendon Nat'l Ins. Co. v. FFE Transp. Servs., Inc.*, 176 F. App'x 559, 562 (5th Cir. 2006) (per curiam).

Also, the insurer must demonstrate *actual prejudice*. Evidence of hypothetical scenarios or prejudice in the abstract is insufficient. *Coastal Ref.,* 218 S.W.3d at 288 ("Courts finding prejudice have done so based on evidence of prejudice actually sustained, not on merely speculative or potential prejudice."). But the insurer need not show the exact outcome of the underlying case had timely notice been given. *FFE Transp. Servs., Inc.*, 176 F. App'x at 562. Instead, the insurer must demonstrate "the precise manner in which its interests have suffered." *Id.*; *Trumble Steel*, 304 F. App'x at 239–40 (quoting Russ & Segalla, Couch on Insurance § 193:29).

Historically, clauses in an insurance policy were treated as conditions precedent, which if breached by the insured, excused the insurer from its payment obligation regardless of whether the

insurer was harmed by the breach. *Coastal Ref.,* 218 S.W.3d at 284–85 (citing *Members Mut. Ins. Co. v. Cutaia*, 476 S.W.2d 278, 279 (Tex. 1972)). But Texas found this rule often resulted in a forfeiture by the insured and thus amended the rule. *See PAJ, Inc.*, 243 S.W.3d at 636. Like most jurisdictions, Texas now treats most policy provisions as covenants, which if breached do not automatically excuse the insurer's obligation to pay. *Id*. at 631 (citing *Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994); *see also Saint Paul Guardian Ins. Co. v. Centrum G.S. Ltd.*, 383 F. Supp.2d 891, 901 (N.D. Tex. 2003) ("[T]he Fifth Circuit has recognized a modern trend in the case law away from the traditional contractual approach towards a view that considers prejudice to an insurer a relevant factor in determining whether to enforce a condition precedent to insurance coverage.").

Under the modern approach, the promise to provide timely notice or immediately forward legal papers is not material to the agreement. *PAJ, Inc.*, 243 S.W.3d at 636. An insurer does not include a notice provision for the sake of receiving notice. The value of timely notice is that it allows the insurer an opportunity to protect its interests (typically financial) and rights that might otherwise be diminished or forfeited. *See, e.g.*, *Nat'l Union Fire Ins. Co. v. Crocker*, 246 S.W.3d 603, 607–08 (Tex. 2008)(stating that notice-of-suit provisions and provisions that require prompt forwarding of suit papers are designed to notify the insurer that a defense is expected and to give the insurer the opportunity to assume control of the defense); *see also Prodigy Commc'ns Corp.*, 288 S.W.3d at 380 (noting that the timely notice requirement in a claims-made policy allows the insurer the opportunity to investigate, set reserves, and control or participate in negotiations with the person bringing the claim (quoting 13 Couch on Ins. 3d §186.13)).

Because timely notice is not the bargained-for benefit, failure to comply with a policy's notice requirement does not amount to a material breach by the insured. Furthermore, a mere immaterial

breach does not automatically allow an insurer to avoid payment under the policy. *PAJ, Inc.*, 243 S.W.3d at 631 ("[A]n immaterial breach does not deprive the insurer of the benefit of the bargain and thus cannot relieve the insurer of the contractual coverage obligation.").

Instead, the insurer must demonstrate that the breach is material, which requires proof of prejudice. *Hanson Prod. Co. v. Ams. Ins. Co.*, 108 F.3d 627, 630 (5th Cir. 1997) ("Where the insurer is not prejudiced by the breach, the breach is not material, the insurer has not been deprived of the benefit of the bargain, and it should not be relieved of its obligation to provide coverage."). The Texas Supreme Court has further explained the prejudice requirement:

> In determining the materiality of a breach, courts will consider, among other things, the extent to which the nonbreaching (sic) party will be deprived of the benefit that it could have reasonably anticipated from full performance. The less the non-breaching party is deprived of the expected benefit, the less material the breach.

*Hernandez*, 875 S.W.2d at 693 (citations and footnotes omitted).

Thus, prejudice simply means that the insurer lost what it actually bargained for. 13 Couch on Insurance 3d § 193.28 ("[T]he test for determining prejudice to an insurer from untimely notice . . . is whether the underlying purpose of the notice requirement was frustrated by the late notice."). In the case of untimely notice, the insurer must show "that there was a substantial likelihood of avoiding or minimizing the covered loss" had the insurer been given the opportunity to exercise its rights under the policy—such as the right to investigate or participate in the defense. *Trumble Steel*, 304 F. App'x at 240 n.19 (quoting 13 Couch on Ins. 3d § 193.29).

As discussed earlier, Texas now broadly applies this notice-prejudice rule. It recently was extended to cover both occurrence and claims-made policies.[8] *Prodigy Commc'ns Corp.*, 288 S.W.3d

---

[8]See note 5 for discussion of claims-made and occurrence policies.

at 382. Thus, Texas has morphed into a strict notice-prejudice jurisdiction in which an insurer must show prejudice in nearly all cases to avoid coverage following untimely notice.

In applying the notice-prejudice rule, many courts have sought to define "prejudice" by example or by its properties. In so doing, courts have distinguished cases in which the insurer received *no* notice from cases involving *late* notice.

When notice is entirely lacking—such as when it comes after the entry of judgment—prejudice is presumed as a matter of law. *Md. Cas. Co. v. Am. Home Assurance Co.*, 277 S.W.3d 107, 118–19 (Tex. App.—Houston [1st Dist.] 2009, pet. granted) ("[D]etermining whether prejudice arises from tardy notice is a different inquiry than determining whether prejudice arises from a complete lack of notice. . . . [W]holly lacking notice, as opposed to merely late notice, supports a finding of prejudice as a matter of law.") (citing *Nat'l Union Fire Ins. Co. v. Crocker*, 246 S.W.3d 603, 609 (Tex. 2008)). Most commonly, this rule applies following a default judgment. *Coastal Ref.*, 218 S.W.3d at 287.

A default judgment entered before the insurer is notified causes prejudice because of the nature of harm inflicted. "[I]t is not the fact of a change in position, but the substance of the change that generally renders a default judgment prejudicial." *Coastal Ref.*, 218 S.W.3d at 288. Following a default judgment, an insurer—standing in the shoes of the insured—is straddled with a high burden to prove a set of facts that would not have been at issue in the original trial. *Id.* at 288 & n.9 (noting that to overturn a default judgment requires proof related to the reason for the default). This change in position constitutes "actual prejudice." *Coastal Ref.*, 218 S.W.3d at 288.

Conversely, with *late* notice, a balancing approach applies, and the insurer must prove more than mere lost opportunity. If lost opportunity were sufficient to prove prejudice, then every late

notice case would result in prejudice as a matter of law. *Id.* at 291 n.14 ("If the abstract loss of the rights to investigate, defend, participate in, and control settlement negotiations were sufficient to show the necessary prejudice, then delaying notice . . . would always result in forfeiture of coverage.").

Following untimely notice, the insurer must link the lost opportunity to the harm it incurred. This requires proof that the insurer would have exercised the right lost. *See Hernandez*, 875 S.W.2d at 693–94 (noting the absence of evidence that the insurer had ever exercised the lost right and finding that the insurer did not suffer prejudice).[9]

The insurer also must demonstrate a substantial likelihood that exercising the lost right would have made a difference in the underlying action. *Trumble Steel*, 304 F. App'x at 240 n.19 (quoting 13 Couch on Ins. 3d § 193.29). The insurer must show that it would have been better off but for the breach of the contract. *See Int'l Ins. Co. v. RSR Corp.*, 148 F. App'x 226, 232 (5th Cir. 2005) (finding no prejudice when insured failed to obtain consent before reaching a stipulation with the opposing side—which was a breach of the insurance policy—when consent "would have left [the insurer] no better off").

For example, the Fifth Circuit has held that an insurer's lost opportunity to engage in early settlement talks, to persuade others to accept responsibility, and to perform its own immediate

---

[9]In *Clarendon National Ins. Co. v. FFE Transportation Services, Inc.*, the Fifth Circuit held that loss of the right to settle for an amount that would result in zero liability for the insurer constituted prejudice as a matter of law, *even when the insurer offers no evidence that it would have exercised its right to refuse a different settlement*. 176 F. App'x 559, 561–62 (5th Cir. 2006) (per curiam). But the court later distinguished the *Clarendon* holding, noting that *Clarendon* involved the loss of the right to *settle*. *Trumble Steel*, 304 F. App'x at 242. The court refused to apply this same rule to the loss of the right to investigate or evaluate the claim. *Id*. It is undisputed that Lexington did not have the right to settle the Cornelius lawsuit or to approve the settlement.

investigation are insufficient to establish prejudice as a matter of law. *Trumble Steel*, 304 F. App'x at 244. "Without more specific evidence regarding the prejudice that arose from the [lost opportunity], courts are powerless to bridge the gap between the creation of an environment in which prejudice *could* occur and the requisite prejudice showing." *Trumble Steel*, 304 F. App'x at 244. Conversely, loss of the opportunity to investigate *can* amount to prejudice when it is accompanied by a showing that the harm to the insured—and thus to the insurer—could have been alleviated with prompt notice. *See id.* at 243 (discussing *Blanton v. Vesta Lloyds Ins. Co.*, 185 S.W.3d 607, 615 (Tex. App.—Dallas 2006, no pet.)).

As discussed above, Texas law provides several significant guideposts to determine what an insurer must prove to establish prejudice. The insurer must point to a specific right lost. The right must be valuable, otherwise it could not be the bargained-for benefit under the policy. Also, the value must be specific to the present case, rather than valuable in the abstract. Finally, the insurer must show that its damages would have been avoided or minimized with timely notice.

In summary, then, to determine whether Lexington suffered prejudice, the Court must evaluate the following factors:

(1)  what rights Lexington had under the policy and whether they were lost due to ETMC's untimely notice;

(2)  whether Lexington has produced evidence that it would have exercised those rights; and,

(3)  whether Lexington's summary judgment evidence establishes a fact issue that its putative actions would have impacted the outcome of the Cornelius lawsuit.

## IV.    Analysis

Lexington has the burden of demonstrating prejudice from ETMC's untimely notice. *Prodigy Commc'ns*, 288 S.W.3d at 382. For the reasons discussed below, the Court finds that Lexington has not presented sufficient evidence to support a jury finding that it was prejudiced by ETMC's breach of the notice provisions.

### A.    Lexington's Rights Under the Policy

It is undisputed that Lexington is an excess carrier. Also, the parties agree that the policy gave Lexington the "right to participate" in the Cornelius lawsuit. Specifically, the contract provides:

> [Lexington] will not be obligated to assume charge of the investigation, settlement or defense of any claim made, suit brought or proceeding instituted against the insured. [Lexington] will, however, have the right and shall be given the opportunity to participate in the defense and trial of any claims, suits or proceedings relative to any medical incident or occurrence which, in our opinion, may create liability on our part under the terms of this policy.

The "right to participate" is not defined in the policy, but neither party claims that the policy is ambiguous. The Court construes the meaning of unambiguous terms as a matter of law, and thus it falls to the Court to ascertain the boundaries of Lexington's right to participate.

When the policy does not provide a definition of its terms, the Court looks to the plain, ordinary meaning. The Merriam-Webster definition of participate is "to take part" or "to have a part or share in something." Merriam-Webster's Collegiate Dictionary 845 (10th ed. 2002).

Lexington argues that under this definition, the right to participate included the right to be fully involved in every decision and step of the defense, including retaining counsel and preparing witnesses for depositions and trial. In other words, under Lexington's interpretation, the only difference between the right to participate and the duty to defend (which is well-defined in the case law) is that one—the duty to defend—is obligatory and the other—the right to participate—is

optional. On the other hand, ETMC argues that right to participate merely encompasses the right to be informed, including access to privileged information. ETMC distinguishes participation in the Cornelius lawsuit from control of over the lawsuit.

Case law provides little, if any, guidance on the scope of an insurer's right to participate. In contrast, volumes have been written about an insurer's duty to defend. The parties agree that at the very least, an insurer's "right to participate" must be distinguished from the "duty to defend." Thus, the logical starting place is to consider an insurer's duty to defend, which typically includes the right to control the defense, to reject or accept settlement, and to generally step into the shoes of the insurer in investigating and defending the case. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Traver*, 980 S.W.2d 625, 627 (Tex. 1998).

Based on the plain meaning of *participate,* and after distinguishing it from the duty to defend, it is apparent that Lexington's right to participate allowed the insurer to assist in and supplement the defense of the Cornelius lawsuit. For example, Lexington claims it would have hired monitoring counsel to participate in critical stages of the Cornelius lawsuit. Lexington admits it could not control the defense and that in the event of disagreement between itself and ETMC's defense counsel, ETMC's counsel would be the deciding vote. But contrary to ETMC's position, the right to participate could have significant value to the insurer. An insurer could assert a great deal of influence over the insured's defense even without the right to outright control the defense.

Lexington not only has to prove that it possessed a valuable right, the insurer must have actually lost the ability to meaningfully exercise that right. When an insurer receives late notice of a covered claim or lawsuit, the insurer still has the ability to participate and is expected to do so. *Compare Travelers Indem. Co. of Conn.*, 2004 WL 389090, at *9 (holding that an eighteen-month

delay in notice did not prejudice the insurer when more than two-thirds of the underlying case occurred after the insurer received notice, even though the insured waived certain defenses, prevented early settlement discussions between the plaintiff in the underlying lawsuit and the insurer, and compromised the insurer's ability seek contribution from co-defendants) *with Centrum G.S. Ltd.*, 383 F. Supp. 2d at 902. (stating that prejudice results when the insurer is deprived of an opportunity to investigate and mount an adequate defense because notice is received shortly before the trial date with no time to meaningfully prepare).

In the Cornelius lawsuit, Lexington received notice more than a year before the case settled and months before the court entered partial summary judgment against the hospital on the issue of liability. After Lexington was notified, discovery continued and the parties filed substantive briefing. After receiving notice, Lexington could have participated in investigation of the claim, ongoing discovery, and settlement discussions. The only opportunity that Lexington actually lost was the ability to participate in the nurses' depositions and their deposition preparation. Thus, the Court must consider whether loss of that right caused Lexington actual prejudice.[10]

**B.        Lexington's proposed actions**

*Actual prejudice* requires Lexington to demonstrate it would have seized upon the lost opportunity but for the late notice. Lexington presented an affidavit from Eugene Isotti, the regional

---

[10]Lexington insists that the nurses' depositions were tantamount to a default by ETMC because the nurses admitted liability. Thus, according to Lexington, it was prejudiced as a matter of law. A default judgement is prejudicial as a matter of law because of the heightened and changed burden it imposes, not simply because the insured faces an uphill battle. *Coastal Ref.,* 218 S.W.3d at 288 & n.9. The same heightened burden does not apply prior to judgment, and thus the insurer must demonstrate *actual prejudice. See id.* at 288.

assistant vice president of Lexington's claims handling division. According to Mr. Isotti, Lexington would have investigated and analyzed the facts, assessed opposing counsel, timely engaged experts, determined the value of the case, appointed counsel, assisted ETMC's counsel in preparing witnesses and familiarizing them with the medical records, and evaluated early settlement opportunities (Def.'s R. Ex. 2, Doc. No. 209-3).

Lexington also submitted an internal memo generated by Isotti after Lexington received notice of the Cornelius lawsuit in January 2004 (Def.'s R. Ex. 25, Doc. No. 209-26). The memo detailed Lexington's plan to handle ETMC's claim. The memo establishes—at least generally—the course of action that Lexington actually planned to take in the Cornelius lawsuit. It is a fair inference that Lexington would have taken these same steps earlier had it received timely notice.

But the Court notes a glaring omission from this memo: It indicates no plan by Lexington to participate in depositions or deposition preparation. The memo states that Lexington would have requested summaries of interviews with ETMC's staff as well as deposition summaries (Def.'s R. Ex. 25 at 2–3, Doc. No. 209-26). Lexington also would have requested advance notice of mediation and trial dates, presumably so that Lexington could participate at those stages (Def.'s R. Ex. 25 at 3, Doc. No. 209-26). But nothing indicates a plan to be prospectively involved with deposition preparation or participate during the depositions.

As discussed above, Lexington's case hinges on its ability to prove that it *would* have taken action in the Cornelius lawsuit and Lexington's actions *would* have had some bearing on the outcome. The internal memo seems to contradict Lexington's position that it would have involved itself in the deposition preparation of ETMC's nurses. Furthermore, Lexington does not provide any evidence that Lexington has ever done so as an excess insurer with a limited right to participate. *Hernandez*, 875

S.W.2d at 693–94 (looking at the insurer's past practice as evidence of how it would have handled the present claim).

The Court finds scant evidence that Lexington would have exercised its right to participate in the deposition preparation of ETMC's nurses. However, based on Mr. Isotti's statements and a vague statement in the internal memo directing Lexington's claims department to "follow this matter on an occurrence basis," (Def.'s R. Ex. 25 at 2, Doc. No. 209-26), the Court will assume *arguendo* that this evidence could sustain a jury finding that Lexington would have stepped in to prepare the nurses prior to their depositions.

### C.     The Outcome in the Cornelius Lawsuit

The final step for Lexington is to demonstrate that its participation in the deposition preparation would have lessened its exposure or benefitted Lexington in some other way in the Cornelius lawsuit. A right that would have had no positive impact on the underlying lawsuit is not valuable.

It is apparent that ETMC—and thereby Lexington—faced an uphill battle after the nurses admitted negligence in their depositions. A more problematic question, however, is whether the late notice and untimely forwarding of the suit papers—which prohibited Lexington from participating in the deposition preparation—*caused* the nurses to testify as they did. Also, the Court must consider whether Lexington's involvement in the deposition preparation would have minimized its loss.

Lexington argues that ETMC's counsel mishandled the Cornelius lawsuit, and the nurses' depositions in particular. According to Lexington, the nurses testified erroneously due to poor preparation by ETMC's counsel, and their testimony contradicted the medical records. Lexington claims it would have ensured that the ETMC nurses were properly prepared for their depositions to

avoid such a result. But Lexington solicited no testimony from the nurses regarding how their depositions would have differed if Lexington had better prepared them.

Instead, Lexington offered testimony from John McChristian, an attorney representing another insurer in the Cornelius lawsuit, that the nurses made false statements during their depositions, that they were not negligent, and that they would not have admitted to negligence if they were properly prepared (Def.'s R. Ex. 23 at 70, Doc. No. 209-24). Mr. McChristian testified that after he became involved in the Cornelius lawsuit, at least two of the nurses claimed that *some* of their deposition testimony was inaccurate, and they were prepared to correct or clarify their previous testimony (Def.'s R. Ex. 23 at 179–81, 242–44, Doc. No. 209-24). Lexington's healthcare risk management and legal experts also summarily state that the nurses would have testified differently had they been better prepared (Def.'s R. Ex. 29 at ¶ 11–13, Doc. No. 209-30; Def.'s R. Ex. 8 at 2–3, Doc. No. 209-9).

These statements are far too speculative to support a finding that Lexington was prejudiced. Even Lexington's own claims processor, Mr. Isotti, testified that it was unclear whether the nurses would have testified in a more beneficial manner had Lexington prepared them for their depositions (Pl.'s Mot. Partial Summ. J. Ex. 2-B, Doc. No. 203-3). The nurses admittedly felt unprepared for and even resentful of the deposition process. They gave damaging testimony, they were frustrated that they were not well-prepared, and there were inconsistencies between the nurses' testimony and the medical records. But that does not support the conclusion that their deposition testimony would have been less damaging and the case would have turned out differently had Lexington prepared the nurses for their depositions.

Most importantly, Lexington received notice three months before the court in the Cornelius lawsuit entered summary judgment on the hospital's negligence and seven months prior to the court's

finding that ETMC's negligence caused Mr. Cornelius' damages. After receiving notice, Lexington had the opportunity to brief the issues, clarify the events in question through reference to the medical records and other evidence, and challenge causation. Although the nurses' deposition testimony presented an obstacle for Lexington, it did not rise to the level of a *material* change in position. *See, Coastal Ref.,* 218 S.W.3d at 288 (stating that the relevant inquiry on the issue of prejudice is the substance of the insurer's change in position). Lexington's inability to proceed in the easiest or most preferred manner is not enough to show prejudice. *See Trumble Steel*, 304 F. App'x at 244.

The facts in this case simply cannot support a finding of prejudice. Lexington has not offered summary judgment evidence that timely notice or prompt forwarding of the legal papers would have limited its exposure. Accordingly, Lexington cannot avoid its payment obligation under the policy.

## V.      Motion to Strike

In addition to its motion for partial summary judgment, ETMC filed a Motion to Strike Lexington's Summary Judgment Evidence (Doc. No. 213). The Court finds that even after considering the contested evidence, Lexington has not set forth sufficient evidence to raise a material fact issue. Accordingly, Plaintiff's Motion to Strike Lexington's Summary Judgment Evidence (Doc. No. 213) is DENIED as moot.

## V.      Conclusion

For the reasons stated herein, ETMC's Motion for Partial Summary Judgment (Doc. No. 203) is GRANTED.

Further, Defendant Lexington's Motion for Summary Judgment (Doc. No. 205) is DENIED.

Finally, Plaintiff's Motion to Strike Lexington's Summary Judgment Evidence (Doc. No. 213) is DENIED as moot.

**It is SO ORDERED.**

**SIGNED this 25th day of February, 2011.**

MICHAEL H. SCHNEIDER
UNITED STATES DISTRICT JUDGE